IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STATE V. NAGEL


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STATE OF NEBRASKA, APPELLANT,

V.

DAKOTA NAGEL, APPELLEE.


Filed August 18, 2020.    No. A-20-164.


Appeal from the District Court for Douglas County: MARLON A. POLK, Judge. Reversed and remanded for further proceedings.

Faith M. Kjelstrup and Amy G. Jacobsen, Deputy Douglas County Attorneys, for appellant.

Thomas C. Riley, Douglas County Public Defender, and Lauren J. Micek for appellee.


MOORE, Chief Judge, and RIEDMANN and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

The State of Nebraska appeals the order of the Douglas County District Court granting Dakota Nagel's motion to transfer his criminal case to the Douglas County Separate Juvenile Court. Because there was substantial evidence supporting the retention of the case in the district court for the sake of public safety and societal security and there was a lack of evidence demonstrating that any further rehabilitation through the juvenile system would be practical and nonproblematical in the limited time left under the juvenile court's jurisdiction, we conclude the district court abused its discretion in granting the transfer of Nagel's case to juvenile court, and we remand the cause for further proceedings in the district court.


- 1 -

## II. BACKGROUND

### 1. INCIDENT LEADING TO CRIMINAL CHARGES

On November 12, 2019, officers in an undercover vehicle were following a car when the front passenger began firing shots at the officers' vehicle. The officer driving the vehicle took evasive action by swerving left "so he and his partner did not get shot." The pursuit ended after officers deployed stop sticks causing one of the tires on the suspects' car to deflate. The driver and the passenger, Nagel, were taken into custody. Nagel, who was wearing a global positioning system monitor because he was on juvenile probation, asked the officers "Was the Gang Unit chasing us?" Nagel also commented about the number of officers on the scene, then stated "you all can't handle this one on one?" Officers determined that the firearm used by Nagel during the pursuit had been thrown from the suspects' vehicle. Officers later recovered the unregistered firearm along the path of the pursuit.

Nagel, born in February 2002, was charged in Douglas County District Court with six felonies: discharging a firearm while in, or in the proximity of, a motor vehicle at any person, dwelling, building, structure, or occupied motor vehicle, a Class IC felony; two counts of attempted assault on an officer, Class IIA felonies; and three counts of use of a firearm to commit a felony, Class IC felonies. In January 2020, Nagel filed a motion to transfer his case to juvenile court.

### 2. HEARING ON MOTION TO TRANSFER

A hearing on the motion to transfer was held on February 10, 2020. The juvenile court received into evidence the following exhibits offered by the State: police reports related to the current case and Nagel's juvenile probation file. Nagel's juvenile probation file established that in June 2019, a petition was filed in Douglas County Separate Juvenile Court alleging that Nagel was a child within the meaning of Neb. Rev. Stat. § 43-247 (Reissue 2016) because he had committed theft by receiving $5,000 or more, a Class IIA felony; obstructing a peace officer, a Class I misdemeanor; and disorderly conduct, a violation of an Omaha city ordinance. Nagel admitted to the misdemeanor and violation of the city ordinance and was adjudicated in August 2019. Nagel's statement of offense stated: "I supposly (sic) brought a stolen car to Nebraska from Iowa. And I was calling the officers name[s] but not the ones they got on [the] police report. And I was being a pain in the ass." Nagel was ordered to write letters of apology but "struggled" and "became agitated" with the task.

The juvenile court also received into evidence the following exhibits offered by Nagel: Nagel's juvenile file as a neglected minor which ultimately led to the termination of his mother's parental rights, a January 2020 juvenile court order directing a psychiatric evaluation and co-occurring evaluations for Nagel, Nagel's Individualized Education Plan through the Omaha Public Schools recognizing attention deficit/hyperactivity disorder as his primary disability, Nagel's chemical dependency evaluation completed in February 2020 requesting that an Intensive Outpatient Program be ordered and completion of an IQ assessment, a copy of Nagel's Initial Diagnostic Interview (IDI) completed in October 2019, a presentence investigation report completed for the juvenile court in January 2020, a transcript of Dr. Colleen Conoley's deposition

testimony regarding the mental development of youth, and a U.S. Department of Justice Juvenile Justice Bulletin regarding effective intervention for serious juvenile offenders.

Nagel also called the sole witness at the transfer hearing: Brent Janzen, Nagel's juvenile probation officer. Janzen testified that as a juvenile probation officer, he supervised high-risk juveniles that had been placed on probation by the juvenile court by meeting with them in the community, in the office, and in school to make sure they were following through on court orders and participating in services that had been ordered by the juvenile court. Janzen also testified to the vast spectrum of evaluation methods available to the juvenile court including IDI evaluations, co-occurring evaluations, chemical dependency evaluations, psychiatric evaluations, psychological evaluations, and psychosexual evaluations. The purpose of evaluations was "[t]o determine treatment needs and how to best assist the juvenile." Once the juvenile court received the results of the evaluations, the court could order treatment services including individual therapy, cognitive-based therapy, family therapy, multisystemic therapy, and family preservation services. The juvenile court could also order out-of-home placements including foster care, group home, treatment group homes, psychiatric residential treatment facilities, the Youth Rehabilitation Treatment Center (YRTC) in Kearney, and out-of-state placements including Canyon State in Arizona. According to Janzen, the juvenile court might utilize an out-of-state placement if there were no in-state group homes available, if Nagel had been denied placement at in-state group homes, or if it had been determined that it was in Nagel's best interests to remove him from the area and place him out of state. Janzen noted that the juvenile court only retained jurisdiction over a juvenile until he or she turned 19 years old.

Janzen testified that Nagel had been adjudicated on an August 2019 disorderly conduct docket and also had an open neglect docket from 2010. In the disorderly conduct docket, the juvenile court ordered a chemical dependency evaluation and a psychiatric evaluation. The only other services that Nagel had received other than the IDI evaluation and the chemical dependency evaluation were monitoring and tracking. Janzen admitted that although he was aware of Nagel's gang affiliation, he had not been able to start gang intervention services. Further, Janzen admitted that Nagel had been involved in a fight while in the holding facility which resulted in Nagel being placed in lockdown. Janzen testified that he had intended to recommend out-of-home placement for Nagel at the next juvenile court hearing and that the typical length of treatment at a group home was a year or less.

According to Janzen, if the current district court charges were transferred to the juvenile court:

> Then there would be a detention hearing, and a juvenile docket would be open[ed]. We would have a detention hearing. At that point, there would be, I believe, more than likely, a [presentence investigation for juvenile court] would be ordered and further evaluations. If I were to guess, I would assume probably in this case group home applications would be ordered, as well.

However, Janzen also acknowledged that the district court case involved Nagel being "picked up" after a pursuit by police officers while Nagel fired shots at them and that Nagel is a known member of the East Omaha Crips gang.

When asked if there was sufficient time for Nagel to be rehabilitated by the juvenile court if the case was transferred, Janzen responded: "It would be close, but yes, I mean, there is time. But, I mean . . . there's not a lot of time, but there is time." Janzen testified that it was "[m]ore than likely" that all Nebraska group homes would deny violent offenders with charges like Nagel's and admitted that "locally, in state, I would find that hard to believe that [Nagel] would get into a local group home" and the only place that would take a violent offender was likely Canyon State in Arizona and, if Nagel could not be placed at Canyon State, then YRTC was a "locked facility" and "the last option that Juvenile Courts have as far as out-of-home placement goes." However, Janzen also acknowledged that "[t]ypically, group homes won't accept a juvenile after their 18th birthday, and with [Nagel's] 18th birthday close -- I mean, I have had juveniles accepted at a group home and placed days before their 18th birthday, so it's not impossible, but it's difficult." He noted that, at the time of the hearing, which took place prior to Nagel's 18th birthday, Janzen did not know if Canyon State "would or [would] not" accept placement of Nagel. Further, Janzen stated that placement at Canyon State usually takes "a month, month and a half" between "the time the orders are made and application is sent and acceptance and clears the interstate compact." Janzen could not recall if he ever had a juvenile who had just been adjudicated in juvenile court, with only 1 year left remaining until the juvenile's 19th birthday, and was placed into a group home because, more typically, juveniles were adjudicated at a younger age and eventually they were sent to a group home after other interventions had not worked.

Janzen testified that if a youth is committed to YRTC:

The intent is to be completed in less than a year . . . . If they're committed [to YRTC], they're transported to Kearney, a treatment plan is developed immediately upon their arrival, and then it is up to the youth to work through the program and work through the levels. And then when it is determined that the youth has worked through the program, a re-entry plan will be written by the staff at the YRTC and submitted to the Court within 60 days of the anticipated departure, and then a hearing will be had in the Juvenile Court within 30 days of departure, to determine next steps when leaving the YRTC and what a return to the community will look like.


### 3. DISTRICT COURT ORDER

The district court granted Nagel's motion to transfer this matter to the juvenile court. In its order, the district court acknowledged that Nagel had been adjudicated in the juvenile court in August 2019 for disorderly conduct and obstruction. Then, on November 12, 2019, an unmarked police vehicle was surveilling another individual who was driving a car in which Nagel was a passenger. The district court's order stated that "upon pursuit, it is purported [that] the passenger . . . fired shots at the unmarked police vehicle. After shots were fired, two occupants exited the vehicle and were taken into custody without incident. Reports indicate no one was injured." The court noted that Nagel was "facing a possible sentence of 20-240 years of incarceration." The district court reasoned:

Since [Nagel], at the time of this charge was 17 years old, a transfer to the Juvenile Court would leave that Court with more than one year of jurisdiction. . . . The testimony

and exhibits offered today showed [Nagel] has not received any prior services through the Juvenile Court, and there was no evidence to suggest the various services available through the Juvenile Court would not be available to [Nagel]. Mr. Janzen's testimony demonstrates that probation oversight, tracking services, substance abuse treatment, gang intervention, mental health services, medication, curfew, group home applications, and psychotherapy will be initiated if this case is transferred to juvenile court.

The Court notes that the current charges are serious and do greatly concern public safety, including the alleged use of a firearm, and potential gang association. However, evidence adduced does not establish any particular finding that [Nagel] has any significant sophistication or maturity as far as juveniles go. In fact, the [I]ndividualized Education Plan indicates [that Nagel] has a learning disability; and Dr. Zoucha in the chemical dependency evaluation further recommends IQ testing be pursued. This Court does not believe the charges themselves indicate any desire by this juvenile to be treated as an adult or an extended pattern of living as an adult, but may offer an opportunity for rehabilitative intervention, which is in the best interest of the juvenile.

Accordingly, this Court finds that after considering all of the evidence and reasons presented by both parties, a sound basis does not exist for retaining this case in district court.

The State has timely appealed to this court.

## III. ASSIGNMENT OF ERROR

The State contends that the district court abused its discretion in granting Nagel's motion to transfer to the juvenile court.

## IV. STANDARD OF REVIEW

A motion to transfer a pending criminal proceeding to the juvenile court is reviewed for an abuse of discretion. *State v. Tyler P.*, 299 Neb. 959, 911 N.W.2d 260 (2018); *State v. Esai P.*, 28 Neb. App. 226, 942 N.W.2d 416 (2020). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *State v. Hunt*, 299 Neb. 573, 909 N.W.2d 363 (2018); *State v. Esai P., supra*.

## V. ANALYSIS

### 1. LEGAL FRAMEWORK

Neb. Rev. Stat. § 43-246.01(3) (Reissue 2016) grants concurrent jurisdiction to the juvenile court and the county or district courts over juvenile offenders who (1) are 11 years of age or older and commit a traffic offense that is not a felony or (2) are 14 years of age or older and commit a Class I, IA, IB, IC, ID, II, or IIA felony. Actions against these juveniles may be initiated either in juvenile court or in the county or district court. In the present case, all of the allegations against Nagel put him within this category of juvenile offenders.

When an alleged offense involves charges in which both the juvenile court and the criminal court can exercise jurisdiction, a party can move to transfer the matter. For matters initiated in criminal court, a party can move to transfer it to juvenile court pursuant to Neb. Rev. Stat. § 29-1816(3) (Cum. Supp. 2018). That statute provides, in relevant part, that once a motion to transfer is filed:

> The county court or district court shall schedule a hearing on such motion within fifteen days. The customary rules of evidence shall not be followed at such hearing. The accused shall be represented by an attorney. The criteria set forth in section 43-276 shall be considered at such hearing. After considering all the evidence and reasons presented by both parties, the case shall be transferred to juvenile court unless a sound basis exists for retaining the case in county court or district court.

§ 29-1816(3)(a). In relation to the criteria to be considered by the court in furtherance of a motion to transfer, § 29-1816(3)(a) provides that in making that determination, the court shall consider the following factors set forth in Neb. Rev. Stat. § 43-276(1) (Reissue 2016):

> (a) The type of treatment such juvenile would most likely be amenable to; (b) whether there is evidence that the alleged offense included violence; (c) the motivation for the commission of the offense; (d) the age of the juvenile and the ages and circumstances of any others involved in the offense; (e) the previous history of the juvenile, including whether he or she had been convicted of any previous offenses or adjudicated in juvenile court; (f) the best interests of the juvenile; (g) consideration of public safety; (h) consideration of the juvenile's ability to appreciate the nature and seriousness of his or her conduct; (i) whether the best interests of the juvenile and the security of the public may require that the juvenile continue in secure detention or under supervision for a period extending beyond his or her minority and, if so, the available alternatives best suited to this purpose; (j) whether the victim agrees to participate in mediation; (k) whether there is a juvenile pretrial diversion program established pursuant to sections 43-260.02 to 43-260.07; (l) whether the juvenile has been convicted of or has acknowledged unauthorized use or possession of a firearm; (m) whether a juvenile court order has been issued for the juvenile pursuant to section 43-2,106.03; (n) whether the juvenile is a criminal street gang member; and (o) such other matters as the parties deem relevant to aid in the decision.

In conducting a hearing on a motion to transfer, the Nebraska Supreme Court has further provided that the court should employ "a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile." *State v. Stevens*, 290 Neb. 460, 465, 860 N.W.2d 717, 725 (2015). "In order to retain the proceedings, the court need not resolve every factor against the juvenile, and there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor." *Id.* "The burden of proving a sound basis for retention lies with the State." *Id.*

## 2. DISTRICT COURT'S REASONS FOR GRANTING TRANSFER

In its order, the district court did not specifically identify the individual factors set forth in § 43-276. Instead, in granting Nagel's motion to transfer his case to the juvenile court, the district court reasoned that, although shots were fired at an unmarked police vehicle, Nagel was taken into custody without incident and reports indicated that no one was injured. The district court further reasoned that a transfer to juvenile court would leave that court with more than 1 year of jurisdiction over Nagel, that Nagel had not received any prior services through the juvenile court, and there was no evidence to suggest that the various services through the juvenile court would not be available to Nagel including probation oversight, tracking services, substance abuse treatment, gang intervention, mental health services, medication, curfew, group home applications, and psychotherapy. The district court stated that Nagel did not seem to have "any significant sophistication or maturity as far as juveniles go," had a learning disability, and that an opportunity for rehabilitative intervention was in Nagel's best interests.

Although the district court is not required to address every factor contained in § 43-276(1), the district court's decision not to specifically identify the factors that it was relying on in relation to that statute complicates our analysis of whether the court abused its discretion in transferring Nagel's case to juvenile court given the evidence before it. In order to perform the balancing analysis, we will discuss the factors set forth in § 43-276 in relation to this record, while making reference to those factors the district did appear to discuss in its order.

### 3. WAS TRANSFER ABUSE OF DISCRETION?

### (a) Type of Treatment

The first factor that must be considered in determining whether to transfer a case is "[t]he type of treatment such juvenile would most likely be amenable to." § 43-276(1)(a). The district court appeared to consider this factor and found that it weighed in favor of transferring Nagel's case to the juvenile court. The district court found that there was no evidence to suggest that the various services through the juvenile court would not be available to Nagel including probation oversight, tracking services, substance abuse treatment, gang intervention, mental health services, medication, curfew, group home applications, and psychotherapy. However, the testimony established that Nagel's opportunities for that rehabilitation would likely be available through a group home or YRTC in Kearney. Janzen testified that a group home would not likely accept Nagel after his 18th birthday which occurred 2 days prior to the entry of the district court's order granting his motion to transfer and placement at YRTC could only last until Nagel's 19th birthday. This factor weighs slightly in favor of transferring this matter to the juvenile court. As the district court found, "Mr. Janzen's testimony demonstrates that probation oversight, tracking services, substance abuse treatment, gang intervention, mental health services, medication, curfew, group home applications, and psychotherapy will be initiated if this case is transferred to juvenile court." And the U.S. Department of Justice Juvenile Justice Bulletin admitted into evidence as exhibit 10 documents that appropriate intervention programs have produced "positive, statistically significant effects equivalent to a 12-percent reduction in recidivism. Intervention, therefore, can reduce recidivism." Mark W. Lipsey, David B. Wilson, and Lynn Cothern, *Effective Intervention for*

*Serious Juvenile Offenders*, Office of Juvenile Justice and Delinquency Prevention, Juvenile Justice Bulletin 6 (April 2000). If Nagel is amenable to treatment, the issue is not whether these programs can be "initiated," but whether they can be effective within the timeframe left to rehabilitate Nagel before his 19th birthday as more thoroughly discussed below.

### (b) Whether Offense Included Violence

The second factor is whether there was evidence that the alleged offense included violence. The district court appeared to consider this factor, but apparently did not place much weight on this factor stating that "upon pursuit, it is purported [that] the passenger . . . fired shots at the unmarked police vehicle. After shots were fired, two occupants exited the vehicle and were taken into custody without incident. Reports indicate no one was injured." The court further stated that the "current charges are serious and do greatly concern public safety, including the alleged use of a firearm." The record reflects that the passenger of the vehicle, identified as Nagel, fired shots from an unregistered firearm at two officers in their vehicle. The officer driving the vehicle stated that he took evasive action as a result of the shots. This alleged offense clearly included violence and weighs in favor of retaining Nagel's case in the district court.

### (c) Motivation for Offense

The third factor that must be considered is "the motivation for the commission of the offense." § 43-276(1)(c). The district court's order does not appear to include any facts which are relevant to this factor. However, the record reflects that Nagel's statements upon being apprehended indicated he had knowledge that he was being followed by officers from the gang unit. Upon being apprehended, Nagel commented to the numerous officers responding to the incident: "You all can't handle this one on one?" These statements indicate that there was motivation for the alleged offenses. This factor weighs in favor of retaining Nagel's case in the district court.

### (d) Age of Nagel

The fourth factor that must be considered includes "the age of the juvenile." § 43-276(1)(d). At the time of the February 2020 hearing, Nagel was 17 years old. The juvenile court appeared to consider Nagel's age in granting his motion to transfer stating that a transfer to juvenile court would leave that court with more than 1 year of jurisdiction over Nagel. However, by the time that the court had entered its order granting Nagel's motion to transfer to the juvenile court, Nagel had already turned 18 and, according to Janzen, Nebraska group homes would deny admittance to Nagel due to his violent offense and group homes generally would not accept a juvenile after their 18th birthday. In short, although there was testimony that services could be initiated for Nagel, there was minimal testimony that these services could provide beneficial effects in the limited timeframe to successfully rehabilitate Nagel before the juvenile court lost jurisdiction of him. This factor weighs in favor of retaining jurisdiction in the district court.

### (e) Nagel's Previous History

The fifth factor to be considered is "the previous history of the juvenile including whether he or she had been convicted of any previous offenses or adjudicated in juvenile court."

§ 43-276(1)(e). The district court appeared to consider this factor but placed little emphasis on it, stating: "The testimony and exhibits offered today showed [Nagel] has not received any prior services through the Juvenile Court." However, the record shows that Nagel's previous history includes a 2019 adjudication in the juvenile court and, contrary to the district court's findings, Janzen testified that Nagel had received electronic monitoring, tracking, an IDI evaluation and a chemical evaluation in association with Nagel's 2019 juvenile court adjudication. Further, Nagel's juvenile probation file set forth:

> [Nagel] claimed to have prior experience with numerous community supports and supervision professionals. [Nagel] has worked with a Diversion Officer, Therapist, Psychiatrist, and H.O.M.E. program staff members in the past.

> Ms. Nagel indicated that [Nagel] has previous experience with therapists, and other community supervision programs. [Nagel] has been placed on the H.O.M.E. program, visited with counselors at school, in the home, and in [the] office of 42nd and Center St. Ms. Nagel added, [Nagel] had met with a mental health professional from Boys Town for "a few months."

We acknowledge that the aforementioned services may have been received in association with a prior diversion for being caught in a stolen vehicle, not his 2019 juvenile court adjudication. Regardless, the fact remains that the record reflects that Nagel has received community support services and, despite those services, his behaviors have continued to escalate from the 2019 adjudication for obstruction and disorderly conduct to the 2020 charges for discharging a firearm while in, or in the proximity of, a motor vehicle at any person, dwelling, building, structure, or occupied motor vehicle; two counts of attempted assault on an officer; and three counts of use of a firearm to commit a felony. This factor weighs in favor of retaining jurisdiction in the district court.

(f) Nagel's Best Interests

The sixth factor to be considered is "the best interests of the juvenile." § 43-276(1)(f). The district court considered this factor, stating: "This Court does not believe the charges themselves indicate any desire by this juvenile to be treated as an adult or an extended pattern of living as an adult, but may offer an opportunity for rehabilitative intervention, which is in the best interest of the juvenile." Further, as we recently noted in *State v. Esai P.*, 28 Neb. App. 226, 255, 942 N.W.2d 416, 435 (2020): "[E]very juvenile's best interests would be better served by attempting rehabilitation in the juvenile court system rather than being sentenced to a term of imprisonment in the adult corrections system." Assuming, without deciding, that Nagel could be rehabilitated, this factor would weigh in favor of granting Nagel's motion to transfer to the juvenile court.

(g) Consideration of Public Safety

The seventh factor to be considered is a "consideration of public safety." § 43-276(1)(g). The district court considered this factor, stating: "The Court notes that the current charges are serious and do greatly concern public safety," but apparently did not place significant weight on this factor. Based upon the record, Nagel's actions of shooting at an occupied car constituted a

serious risk to public safety. Further, the record demonstrates that Nagel's behavior is escalating from his 2019 adjudication for obstructing a peace officer and disorderly conduct to his 2020 charges for six felonies. This pattern continues as Nagel, while being held in the holding facility, was placed in lockdown after becoming involved in a fight. This factor weighs in favor of retaining Nagel's case in the district court.

(h) Ability to Appreciate Nature and Seriousness of Conduct

The eighth factor to be considered is a "consideration of the juvenile's ability to appreciate the nature and seriousness of his or her conduct." § 43-276(1)(h). The district court appeared to consider this factor stating:

> [The] evidence adduced does not establish any particular finding that [Nagel] has any significant sophistication or maturity as far as juveniles go. In fact, the [I]ndividualized Education Plan indicates [that Nagel] has a learning disability; and Dr. Zoucha in the chemical dependency evaluation further recommends IQ testing be pursued. This Court does not believe the charges themselves indicate any desire by this juvenile to be treated as an adult or an extended pattern of living as an adult[.]

However, the record reflects that Nagel's decision to discard the gun during the chase indicates his ability to understand the serious nature of his actions. This factor weighs in favor of retaining jurisdiction in the district court.

(i) Need For Detention Beyond Minority

The ninth factor to be considered is "whether the best interest of the juvenile and the security of the public may require that the juvenile continue in secure detention or under supervision for a period extending beyond his or her minority and, if so, the available alternatives best suited to this purpose." § 43-276(1)(i). Nagel was charged with six felonies which the district court noted could lead to a possible total sentence of 20 to 240 years' imprisonment. At the time the district court entered its order, Nagel had reached his 18th birthday, leaving less than 1 year to attempt to rehabilitate him. As it relates to the timing of rehabilitation, the record is extremely limited with the sole reference governing timing to rehabilitate provided by Janzen who stated: "It would be close, but yes, I mean, there is time. But, I mean . . . there's not a lot of time, but there is time." But in direct relation to the remaining time to rehabilitate, Janzen also explained the difficulty associated with getting Nagel into a group home which could accommodate his rehabilitation due to his advanced age and the violent nature of the current offense. As we recently stated in *State v. Esai P.*, "'[A] trial court must balance a juvenile's amenability to complete rehabilitation by age 19 against the public's safety in the event that rehabilitation fails or requires more time than anticipated.'" 28 Neb. App. at 258, 942 N.W.2d at 436-37, citing *State v. Leroux*, 26 Neb. App. 76, 916 N.W.2d 903 (2018). Due to the limited time and limited resources available to rehabilitate Nagel due to his advanced age and the violent nature of the offense, this factor weighs in favor of retaining jurisdiction in the district court.

### (j) Mediation and Pretrial Diversion

The tenth factor to be considered is "whether the victim agrees to participate in mediation." § 43-276(1)(j). This factor is not present in the instant case and is neutral.

### (k) Juvenile Pretrial Diversion Program

The eleventh factor is "whether there is a juvenile pretrial diversion program established pursuant to sections 43-260.02 to 43-260.07." § 43-276(1)(k). This factor is not present in the instant case and is neutral.

### (l) Use or Possession of Firearm

The twelfth factor is "whether the juvenile has been convicted of or has acknowledged unauthorized use or possession of a firearm." § 43-276(1)(l). Although Nagel has been charged with the use of a firearm in this case, he has not admitted to its use, nor has he previously been convicted of the use or possession of a firearm. Consequently, this factor is neutral.

### (m) Juvenile Court Order

The thirteenth factor is "whether a juvenile court order has been issued for the juvenile pursuant to section 43-2,106.03." § 43-276(1)(m). This factor is not present in the instant case and is neutral.

### (n) Gang Member

The fourteenth factor is "whether the juvenile is a criminal street gang member." § 43-276(1)(n). The district court considered this factor stating that Nagel had "potential gang association." However, the record is undisputed that Nagel is a member of the East Omaha Crips gang. This factor weighs in favor or retaining jurisdiction in the district court.

### (o) Other Matters

The last factor is "such other matters as the parties deem relevant to aid in the decision." § 43-276(1)(o). This factor is not applicable and is neutral.

### (p) Summary

As the Nebraska Supreme Court noted in *State v. Stevens,* 290 Neb. 460, 465, 860 N.W.2d 717, 725 (2015), in conducting a hearing on a motion to transfer, the court should employ "a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile." That task becomes increasingly difficult in cases such as this where violent crimes are committed at an advanced age because of the limited time to complete rehabilitation by age 19. Our court made reference to that difficulty in *State v. Leroux*, 26 Neb. App. at 118, 916 N.W.2d at 929, where, after summarizing numerous cases involving violent crimes committed by youth of more advanced age, we held:

> The theme evident in the cases discussed above is this: When a juvenile commits a violent crime, the trial court is not likely to grant a request to transfer to the juvenile court because (1) the juvenile court will lose jurisdiction when the defendant turns 19 years of age which may not allow sufficient time for the complete rehabilitation of the juvenile, and

therefore retention is necessary to ensure public safety, and (2) there is no secure youth detention facility available which can safely provide the appropriate services and treatment for a juvenile who has committed a more serious offense. This means that a trial court must balance a juvenile's amenability to complete rehabilitation by age 19 against the public's safety in the event that rehabilitation fails or requires more time than anticipated. The trial court's decision carries the consequence that if the decision is wrongly made, we have either missed an opportunity to rehabilitate a juvenile outside the negative influences of adult incarceration or failed to adequately incarcerate a potentially dangerous juvenile who will go on to commit further violent crimes.

In its order, the district court expressed concern with allowing the matter to remain in the district court and not granting the transfer noting that in relation to the current charges that Nagel was "facing a possible sentence of 20-240 years of incarceration." To the extent a youth of advanced age may be amenable to treatment options in the juvenile court, the possibility of disposition under the juvenile code in the district court remains available to juveniles pursuant to Neb. Rev. Stat. § 29-2204.02(6) (Reissue 2016), which specifically provides:

If the defendant was under eighteen years of age at the time he or she committed the crime for which he or she was convicted, the court may, in its discretion, instead of imposing the penalty provided for the crime, make such disposition of the defendant as the court deems proper under the Nebraska Juvenile Code.

In performing the balancing analysis here, we note that a majority of the factors listed in § 43-276(1) weigh in favor of retaining jurisdiction in the district court. Those factors include, but are not limited to, the violent nature of the offense, Nagel's motivation for committing the act, Nagel's advanced age, Nagel's previous history and commission of the act while on probation and demonstrating an escalation of behavior, Nagel's ability to appreciate the nature and seriousness of his conduct, the fact that Nagel is a gang member, and the importance of protecting the security of the public by keeping Nagel in secure detention for a period extending beyond his minority in relation to the possibility of rehabilitation in the short period of time left before the juvenile court loses jurisdiction over him. In fact, of all of the § 43-276(1) factors, the only factors favoring transfer to the juvenile court are Nagel's potential amenability to rehabilitation and best interests in the event he can be rehabilitated prior to his 19th birthday. Although Nagel's counsel argues that the State failed to meet their burden to show Nagel cannot be rehabilitated in a timely manner, we disagree with that premise. The State's burden here was to prove "a sound basis for retention." *State v. Stevens*, 290 Neb. 460, 465, 860 N.W.2d 717, 725 (2015). The State clearly met that burden by providing evidence of factors set forth in § 43-276(1) which, as we discussed above, weigh heavily in favor of retaining this matter in district court. Although Nagel contends that this rehabilitation may be facilitated in the limited time left prior to reaching the age of majority, the evidence does not support that proposition.

We find that under this record, the district court abused its discretion in granting Nagel's motion to transfer this matter to the juvenile court. In so holding, we repeat our recent holding in *State v. Esai P.*, 28 Neb. App. 226, 260, 942 N.W.2d 416, 438 (2020), where we noted:

Given the substantial evidence supporting retaining the cases in the district court for the sake of public safety and societal security, and the lack of evidence demonstrating any further rehabilitation through the juvenile system would be practical and nonproblematical in the limited time left under the juvenile court's jurisdiction, we conclude the district court abused its discretion in granting the transfer . . . to the juvenile court.

## VI. CONCLUSION

For the reasons set forth herein, we reverse the district court's order granting Nagel's motion to transfer the proceedings to the juvenile court and we remand the cause for further proceedings in the district court.

REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.